FRED PANNELL v. CECIL L. EARLS ET AL

5-5638                                        483 S.W. 2d 440

Opinion delivered April 24, 1972

*Gerland P. Patten* and *Charles B. Roscopf,* for appellant.

*Joe C. Barrett, Walter P. Armstrong, Jr.,* and *Randy W. Ishmael,* for appellee.

J. FRED JONES, Justice. This is an appeal by Fred Pannell from an adverse decree of the Phillips County Chancery Court in a suit brought by Pannell to have title confirmed and quieted in him, as against Cecil L. Earls, E. M. Regenold, et al. The land involved consists of approximately 2,000 acres lying east of the Mississippi River and attached to the state of Mississippi on the river's eastern shore. The appellant contends that the land has always been in Phillips County, Arkansas, and that by avulsive action in 1858 the river changed its course severing the land from the rest of Arkansas and by subsequent accretions attaching it to the state of Mississippi. The appellees content that the land was never a part of the state of Arkansas but became a part of the state of Mississippi by gradual accretion to the east bank of the river throughout the years since 1830.

The chancellor found the lands to be in the state of Mississippi and the Phillips County Chancery Court without jurisdiction of the subject matter. The chancellor dismissed Pannell's petition for want of equity and on appeal to this court Pannell relies on the following point for reversal:

"The court erred in holding that the land is in the state of Mississippi and that it was without jurisdiction to try title thereto."

The facts appear as follows: In February, 1967, Mrs. Doris B. Pannell, the wife of the appellant, obtained an Arkansas State Land Commissioner's deed to land in Phillips County described as follows:

"S½ Frl SE Sec 8-5S-3E-40.41 acres
S½ Frl SW Sec 8-5S-3E-27.40 acres."

This deed indicates that these lands were forfeited to the state under the above descriptions for the nonpayment of

taxes in 1904 and 1906 respectively. On February 20, 1967, Mrs. Pannell also obtained an Arkansas State Land Commissioner's deed to land in Phillips County described as follows:

"Fral. all Sec. 17-Twp. 55-R3E-302.32 acres."

This deed indicates that the land was forfeited to the state under the above description for the nonpayment of taxes in 1927. On January 15, 1969, Mrs. Pannell deeded this property to Beverly Kathleen Schaffhauser by special warranty deed reciting the description as follows:

"All of Fractional Section 17; S½ Frl. SE¼ of Section 8; and the S½ Frl. SW¼ of Section 8; all in 5S-3E, Phillips County, Arkansas, and all accretions thereunto belonging, which said original lands and accretions would be described if the Township, Range and Section lines be extended Eastward as all of Sections 7, 8, 9, 16, 17, 18, 19 & 20, 5S-3E, which lie East of the present main channel of the Mississippi River and West and North of the abandon channel of the Mississippi River marking the state line between the states of Arkansas and Mississippi and referred to on maps and charts as 'Old River.' "

On January 22, 1969, Schaffhauser deeded the property back to Mrs. Pannell and Sam J. Howe under the same description and on January 27, 1969, the appellant Fred Pannell obtained a special warranty deed from his wife and Mr. Howe to land under the same description as above. It appears from the pleadings and evidence that the above lands are also claimed as lands in the state of Mississippi by the appellees.

This case was tried for two weeks in the chancery court and both sides submitted numerous exhibits as well as voluminous expert and lay testimony in support of their respective contentions. The determining factor before the chancellor actually boiled down to the fact question of whether this land became a part of the state of Mississippi by accretion or whether it was cut off from the rest of Arkansas by avulsive action of the Mississippi River. The question before us on appeal is whether the chancellor's decree is clearly against the preponderance of the evidence.

The division line between Arkansas and the state of Mississippi is fixed as the middle of the main channel of navigation of the Mississippi River. Article 1, Arkansas Constitution 1874; *Arkansas* v. *Mississippi,* 250 U. S. 39, 63 L. ed. 832, 39 S. Ct. 422. The appellant argues he clearly proved by the preponderance of the evidence, that prior to 1858 the land involved was on the west and Arkansas side of the main channel of the Mississippi River and that by avulsive action occuring in 1858, the river changed its course to its present position leaving the land involved as an island on the east side of the main channel of the river and by subsequent accretions it became attached to the east shore.

The appellees argue that the appellant has failed to prove such avulsion occurred in 1858 or at any other time. They argue that the river gradually changed its course to its present position by eroding away the Arkansas shore, and that the land involved was added to the state of Mississippi by gradual accretion and not by avulsion.

A riparian owner of land in Arkansas who undertakes to prove Arkansas title to land on the east shore of the Mississippi River, has a considerable burden in proving that the land was severed from Arkansas by sudden avulsion. This is true because there is a strong presumption in favor of the permanency of land boundary lines. See *Wyckoff* v. *Mayfield,* 280 P. 340 (1929), 9 C. J. § 300. Furthermore, when land lines are altered by the movement of a stream, the weight of authority, both state and federal, appears to recognize a strong presumption, founded on long experience and observation, that the movement occurs by gradual erosion and accretion rather than avulsion. *United States Gypsum Co.* v. *Reynolds,* 18 So. 2d 448 (1944); *Dartmouth College* v. *Rose,* 133 N. W. 2d 687 (1965); *Kitteridge* v. *Ritter,* 151 N. W. 1097; *Bone* v. *May,* 225 N. W. 367.

It would serve no useful purpose to set out in detail the evidence in this case. Suffice it to say, both sides presented conflicting expert testimony as to the hydraulics of the changing thalweg of the Mississippi River as related to its erosive effects on both banks of the

river. Both sides presented conflicting evidence as to the significance of forestry and vegetation found on and in the area involved. The appellant offered maps from the United States General Land Office Survey of 1830 showing the land involved to be partially on "Island 64" with the main channel of the Mississippi River running east of the island and an "island chute" running west of the island between Island 64 and the remainder of Phillips County, Arkansas. Later maps offered by both sides show the area involved to be on the east side of the main channel of the river and firmly attached to the general land mass forming the state of Mississippi.

The appellant relies heavily on probate court records, and most heavily on a map or plat in connection with the administration of the estate of Jehoida Halsey under his will made and probated in Coahoma County, Mississippi, in 1866. For the purpose of our discussion here we may assume that Halsey owned land in Phillips County by deed of conveyance dated 1857 with description as follows:

"SW Frl ¼ (West of East Island Chute and west Frl ½ of the NW Frl ¼ of Frl Section 17-5S-3E, in the District lands subject to sale at Helena, Arkansas, containing 118.26 acres."

An abstract of title was submitted in evidence and according to the abstract, on August 15, 1866, this land was sold to William I. Robson under the residuary clause of Halsey's will. The description in the executor's deed is as follows:

"Island 64 being all of Section 17 and all of Section 18 South of the dividing line between Jones Halsey's heirs except Henry's interest, according to recent Survey 393.34 acres and 127.50 acres of Batture, in Township Five South, Range Three East in Phillips County, Arkansas."

It is in connection with the "recent survey" recited in this deed that the map or plat designated "Fontaine Survey" was introduced. For a clearer understanding of its significance we are reproducing it here.

Defendants Exhibit 58
Fontaine Survey

It will be noted that in the executor's deed to William I. Robson the deed recites the conveyance of "Island 64 being *all of Section 17* and all of Section 18 South of the dividing line," etc. (Emphasis added). It will also be noted from the map or plat, that what appears to be the main channel of the Mississippi River is designated "Mississippi River Cutthru 1858" and the land lying in Section 18 west of the river is designated *"Old* Island 64," (emphasis added), and the land lying east of the main channel is designated *"East* Island 64 or Robson Island." (Emphasis added). Also on a part of "Old Island 64" and west of the main channel of the river is shown

a dead end appearing area designated as "Old Chute," and east of "East Island 64 or Robson Island" is designated a dead end appearing area labeled "Old Bed Mississippi River." It would appear therefore, if the designations on this exhibit represent the result of an avulsion occuring in 1858, the river channel did not change to the original "East Island Chute" as would have appeared logical, but it took a less logical course through the middle of Island 64 and did not bother to fill its original bed or the East Island Chute. According to this exhibit, on July 2, 1866, "Old Island 64" was attached to the state of Arkansas and "East Island 64 or Robson Island" was attached to the state of Mississippi, with the exception of the dead end area designated as "Old Bed Mississippi River."

It is also noted from the abstract of title, when William I. Robson transferred this land to Merlin Perry, three days after he purchased it, no reference is made to "Old Island 64" and "East Island 64 or Robson Island," but the land is simply described as:

> "Island 64, being all of Section 17 and all of Section 18 South of the dividing line between Jones and Halsey's heirs except Henry's interest, according to recent Survey 393.34 acres and 127.50 acres of Bottom in Township 5 South, Range 3 East."

According to the abstract of title, in 1868 Sarah A. Perry deeded this land to Dewitt C. Hughey and John R. McGuire, under description as follows:

> "The NW frl. ¼ of Section 17,
> SW frl ¼ of Section 17,
> NE frl ¼ of Section 17, et al lands,
> all in 5S-3E, containing about 400
> acres all on Island No. 64."

Other trust deeds of record through 1877 refer to the land as being 400 acres on Island 64. On February 8, 1879, Hughey and McGuire executed a deed to Prince Malloy describing the land as follows:

> "NW Frl ¼ Section 17, 152.72 acres;
> SW Frl ¼ Section 17, 61.23 acres, all in 5S-3E
> et al land."

Except for forfeitures for nonpayment of state taxes and levee district assessments, no further reference is made to the acreage in the land until in 1926 when the state Land Commissioner of Arkansas made a deed to C. W. Hunter reciting conveyance of:

"All Fractional Section 17, Twp 5S, Rge 3E, containing 302.13 acres, more or less."

This deed, however, was based on a 1904 forfeiture. In 1928 C. W. Hunter made a warranty deed to "C. W. Hunter Company" describing the land as:

"All Frl Section 17, Twp 5S, R3E—302.13 acres, et al lands, Phillips County, Arkansas."

No additional transfers of this land appear of record until the 1967 deed from the state Land Commissioner to Doris B. Pannell.

This so-called Fontaine survey map with its designated "Mississippi River Cutthru 1858" is the primary evidence upon which appellant relies to sustain his theory that the land involved was separated from the Arkansas mainland by avulsion in 1858. This instrument was vigorously attacked by the appellees who offered expert testimony that the paper on which the instrument was drawn contanined the element titanium which was not used in the manufacture of paper prior to 1932. The appellees also produced a handwriting expert who testified that the spencerian handwriting in which this instrument is drawn was accomplished, not in a bold freehand style, but by small separate strokes of the pen. It does not require an expert to detect the last above observation for it is obvious, even from the photographic copy in the abstract of title, that the flourishes to the handwritten letters were done in small short strokes of the pen. If it was the intention of the scrivener to pass the document off as the original of an ancient map or plat, his efforts were crudely performed and his purpose poorly accomplished.

Even though the integrity of this instrument was severely impeached as an original map or plat prepared by Surveyor Fontaine in 1866, that does not necessarily mean it

was fraudulently prepared and secretly inserted in the probate record books pertaining to the probate of the estate of Jehoida Halsey and where, theoretically, it had lain loose and without observation for over 100 years. It is entirely possible that this instrument was copied from one previously prepared and the scrivener doing the copy work attempted to simulate the spencerian style of penmanship used in the original and in doing so, simply had more time on his hands than fraud on his mind. Aside from the conflicting evidence as to how this instrument was found loose in one of the probate record books in Phillips County, there is no authenticity whatever attached to it as a surveyor's map or plat of the area indicated. There is ample evidence to indicate that this plat referred to as "Fontaine survey" is at most, a freehand copy drawing of some other instrument which could have been as easily prepared for the purpose of demonstrating contentions as recording or demonstrating facts. This land was involved in court litigation on previous occasions and the instrument could have been prepared by a witness for use in testifying in previous and related litigation as well as in the case at bar. This instrument on its face would indicate that it was prepared for some purpose other than to accurately set out and record events in the vicinity in 1858, and certainly the notation "Mississippi River Cutthru 1858" could have been self-serving as well as strictly hearsay.

We agree with the chancellor that the appellant failed to sustain his burden of proving the alleged effects of an avulsion on the Mississippi River occuring in 1858. In any event, we are unable to say that the chancellor's decree is against the preponderance of the evidence.

The decree is affirmed.

FOGLEMAN, J., not participating.